# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PAC-WEST DISTRIBUTING NV LLC, | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| AFAB INDUSTRIAL SERVICES, INC., | : | |
| et al., | : | **No. 19-3584** |
| *Defendants* | : | |

## <u>MEMORANDUM</u>

PRATTER, J.                                                                                          MAY *22*, 2023

The sellers and distributors of various cleaning products find themselves in something of a messy procedural morass. Pac-West Distributing NV LLC initiated this lawsuit, alleging that AFAB Industrial Services, Inc., and Everett Farr, III[1] infringed upon Pac-West's trademarks and trade dresses, breached the parties' prior settlement agreement, and tortiously interfered with Pac-West's current and prospective contractual relationships. AFAB filed various counterclaims, asserting, *inter alia*, that Pac-West tortiously interfered with AFAB's contractual relationships, that Pac-West's marks should be cancelled or deemed abandoned for unlawful use, and that Pac-West's marks should be cancelled because they were fraudulently obtained. Because AFAB has failed to satisfy its evidentiary burden as to the tortious interference and fraud claims, and because the Court declines to adopt a lawful use requirement, the Court grants Pac-West's motion for summary judgment challenging the AFAB counterclaims in part and deems this motion moot in part.

---

[1] The Court refers to Defendants collectively as "AFAB."

BACKGROUND

The Court writes for the benefit of the parties and assumes basic familiarity with the facts of this case. *See Pac-W. Distrib. v. AFAB Indus. Servs., Inc.*, No. 19-3584, 2020 WL 4470447, at *1–*2 (E.D. Pa. Aug. 4, 2020).

## I. Prior Litigation and Settlement

AFAB previously sued Pac-West in 2015 for common law defamation, tortious interference with prospective business relations, and unfair competition. *See Farr et al. v. Pac-West Distrib. NV LLC. et al.*, No. 16-cv-175. AFAB also filed a petition to cancel Pac-West's registrations for its RUSH, PWD, and POWER PAK PELLET marks and notices of opposition to Pac-West's applications for NEVER FAKE IT! and SUPER RUSH. In that earlier suit, Pac-West counterclaimed for defamation, false advertisement, trade dress infringement, false designation of origin, and common law unfair competition, claiming that AFAB infringed upon its trademarks and trade dresses associated with the RUSH, PWD, SUPER RUSH, POWER-PAK PELLET and the unregistered NEVER FAKE IT! marks. The parties entered into a settlement agreement on August 23, 2016 that, among other terms, dismissed the litigation with prejudice and resolved the petition to cancel and notices of opposition.

## II. This Case

Three years after the supposed resolution of the parties' commercial claims against each other, Pac-West filed the instant action against AFAB and Mr. Farr in August 2019. Pac-West's amended complaint states that it owns various trademarks for its products, which include nail polish removers, incense, desiccants, and other related cleaning products.

Pac-West alleges that AFAB has "purposefully advertised, promoted, offered for sale, sold, distributed and continue[s] to advertise, promote, offer for sale, sell and distribute" products that

infringe on Pac-West's IRON HORSE, RUSH ORIGINAL, and GOLD RUSH marks as well as various trade dresses associated with its products bearing the IRON HORSE, RUSH ORIGINAL, GOLD RUSH, SUPER RUSH, RUSH, and NEVER FAKE IT! marks. Am. Compl. ¶¶ 14, 20, 34. Pac-West contends that AFAB's products mimic the color combinations, images, the position, format, size, and content of text, the "clutter free overall layout," and bottle shapes of various Pac-West products. *Id.* ¶¶ 21, 39. Pac-West asserts that AFAB made changes to its product labels and packaging to mimic Pac-West's trade dresses after the parties entered into the settlement agreement. *Id.* ¶ 43.

Pac-West also alleges that AFAB breached the 2016 settlement agreement by failing to identify its corporate name and address on the packaging of products bearing the words RUSH, PWD, SUPER RUSH, POWER-PAK PELLET, and NEVER FAKE IT! *Id.* ¶ 63.

AFAB filed an answer with three counterclaims and then a month later filed First Amended Counterclaims. The Court granted Pac-West's motion for partial dismissal of these counterclaims. *Pac-W. Distrib. NV LLC v. AFAB Indus. Servs. Inc.*, No. 19-cv-3584, 2022 WL 717276, at *5 (E.D. Pa. Mar. 10, 2022). Pac-West filed the now-pending motion for partial summary judgment on the remaining counterclaims. The Court heard oral argument and has accepted the parties' written submissions.

## LEGAL STANDARD

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). "The mere existence

of a scintilla of evidence in support of the [claimant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [claimant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). There is nothing unfamiliar in the foregoing description of the legal landscape for evaluating summary judgment issues.

**DISCUSSION**

Pac-West moves for summary judgment on Counts III, IV, V, VI, VII, and VII of AFAB's counterclaims. At oral argument, AFAB agreed to withdraw Count III, relating to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201-1, *et seq*. Therefore, the Court deems this portion of Pac-West's summary judgment motion moot and turns to the remaining counts.

## I.     Counts IV and V – Tortious Interference

Counts IV and V of AFAB's counterclaims assert that Pac-West tortiously interfered with contractual relations between AFAB and its distributors by representing that, under the terms of the settlement agreement, AFAB was not permitted to sell products bearing the PWD, RUSH, SUPER RUSH, GOLD RUSH, POWER PAK PELLET, IRON HORSE, and/or NEVER FAKE IT WITHOUT IT! marks, thereby confusing AFAB's distributors.

To prevail on a claim for tortious interference with existing or prospective contractual relationships under Pennsylvania law, AFAB must prove:

(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party;

(2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant;

(4) legal damage to the plaintiff as a result of the defendant's conduct; and

(5) for prospective contracts, a reasonably likelihood that the relationship would have occurred but for the defendant's interference.

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).

4

Pac-West challenges these counterclaims on two grounds.  First, Pac-West asserts that AFAB has not pled these counterclaims with enough specificity because the counterclaims identify neither any particular distributors or statements made by Pac-West nor any specific allegations of Pac-West's wrongful conduct or intention to harm AFAB's business.  The only evidence that AFAB musters in opposition is the deposition of Sarita Krupa, an employee with one of AFAB's distributors, who testified that Trent Taylor, Pac-West's corporate agent, asked her company not to do business with AFAB and that this "damaged" the business relationship with AFAB.  Krupa Dep. at 41:3–23.  Because AFAB does not identify any other specific statements made by Pac-West, the Court may only entertain possible tortious inference claims based on Ms. Krupa's testimony.

Pac-West's second argument is that AFAB has presented no evidence that the alleged statement made to Ms. Krupa resulted in any damages.  Under Pennsylvania law, damages for a tortious interference claim may be established by reference to "the pecuniary loss of the benefits of the contract or the prospective relation; . . . consequential losses for which the interference is a legal cause; and . . . actual harm to reputation, if [it is] reasonably to be expected to result from the interference." *Pawlowski v. Smorto*, 588 A.2d 36, 40 (Pa. Super. Ct. 1991).

AFAB cites to Ms. Krupa's deposition testimony that Mr. Taylor's statements "damaged" her company's relationship with AFAB.  But there is no evidence in the record that Ms. Krupa's company ceased its dealings with AFAB as a result of these statements.[2]

---

[2] To the contrary, Ms. Krupa testified that the alleged statements occurred in 2018 and that in that same year her company increased its business with AFAB.  Krupa Dep. at 56:9–16, 68:6–69:4.  AFAB protests that Ms. Krupa never explicitly testified that her company did *not* stop dealing with AFAB as a result of the alleged statements, but that is beside the point.  At the summary judgment stage, the burden is on AFAB to produce affirmative evidence in support of its claims.

To prevail on a tortious interference claim, AFAB must be able to provide specific evidence of legal, monetary damages stemming from any alleged interference. On that front, there is no evidence in the record from which a jury could even begin to ascertain either the amount, or even the existence, of AFAB's pecuniary losses. Indeed, in its counter-statement of facts, AFAB repeatedly asserts that "[i]t is impossible to know" whether Pac-West's statements resulted in lower sales, lost business opportunities, or reputational harm to AFAB. Def.'s Counter-Statement of Facts ¶¶ 108, 109, 111. Without evidence, and faced with the claimant's own acknowledgement of the impossibilities at hand, there can be no triable issue as to damages. Therefore, the Court grants summary judgment in Pac-West's favor on Counts IV and V.

## II.    Counts VI and VII – Unlawful Use

Counts VI and VII of AFAB's counterclaims seek cancellation of Pac-West's marks on the grounds that the marks are not "in use in commerce" as required by the Lanham Act, *see* 15 U.S.C. § 1051(a)(3)(C), or, alternatively, Pac-West and its predecessors have abandoned their marks by failing to use them in commerce.[3]

Both claims rely on the argument that Pac-West's trademarks cannot lawfully be used in commerce on Pac-West's products. Specifically, AFAB contends that Pac-West's products violate 15 U.S.C. §§ 2057a and 2057b, which provide that butyl nitrite and volatile alkyl nitrites "shall be considered . . . banned hazardous product[s]." 15 U.S.C. §§ 2057a (a), 2057b(a). There is an exception for products that are manufactured or sold "for any commercial purpose," which is

---

[3] Pac-West, citing *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337 (2d Cir. 1999), asserts that AFAB cannot bring unlawful use counterclaims because they were not raised in AFAB's answer. In *Lane*, however, the court affirmed the district court's grant of summary judgment, not because the defendant failed to raise unlawful use in its answer, but because the defendant "first raised the unlawful use defense in its memorandum of law opposing summary judgment." *Id.* at 350. In contrast, where courts recognize the unlawful use doctrine, it may be appropriately raised for the first time in a counterclaim. *See, e.g., Cookies SF LLC v. Cake Distro, Inc.*, No. 22-cv-1364, 2022 WL 18228278, at *6-*7 (C.D. Cal. Nov. 22, 2022).

defined as "any commercial purpose other than for the production of consumer products containing butyl nitrite [or volatile alkyl nitrites] that may be used for inhaling or otherwise introducing butyl nitrite [or volatile alkyl nitrites] into the human body for euphoric or physical effects." *Id.* at §§ 2057a(b)–(c); *see also id.* §§ 2057b(b)–(c). AFAB contends that Pac-West's products do not fall within the "commercial purpose" exception because they "may be used" as inhalants.[4]

AFAB's argument relies on the "unlawful use doctrine." One of the Lanham Act's requirements for trademark registration is that the mark "is in use in commerce." 15 U.S.C. §1051(a)(3)(C). Beginning in the 1950s, the USPTO's Trademark Trial and Appeal Board ("TTAB")—the body tasked with adjudicating the validity of trademarks—has stated that this requirement means that a mark must be in use in *lawful* commerce. *See, e.g., Clorox Co. v. Armour-Dial, Inc.*, 214 U.S.P.Q. 850, 1982 WL 50434, at *1 (T.T.A.B. 1982) ("It has been the consistent position of [the TTAB] and the policy of the Patent and Trademark Office that a 'use in commerce' means a 'lawful use in commerce . . . .'") The TTAB applies this doctrine when a party opposes a pending trademark registration or wants to a cancel a mark. *See, e.g., Gen. Mills Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1992 WL 296518, at *1, *3–*4 (T.T.A.B. 1992); *Satinine Societa in Nome Collettivo di S.A. e. M. Usellini v. P.A.B. Produits et Appareils De Beaute*, 209 U.S.P.Q. 958, 1981 WL 48126, at *1, *6 (T.T.A.B. 1981). The TTAB finds a use

---

[4] In so doing, AFAB urges the Court to read the term "may be used for" expansively to cover any product that could conceivably be inhaled by a consumer, regardless of the purpose for which the product admittedly was manufactured or sold. This is so because all butyl and alkyl nitrites are volatile and thus capable of being inhaled. Thus, this construction would appear to read the "commercial purpose" exception out of the statute. In response, Pac-West argues that the term "may be used for" in §§ 2057a and 2057b is best read as referring to the intention or purpose behind a product, rather than the mere physical possibility that a product *could be* inhaled. A review of similar language in analogous statutes suggests that giving the term "may be used for" the broad construction AFAB advances here would have similarly expansive consequences. *See, e.g.,* 19 U.S.C. § 1305(a) (prohibiting the importation of "any printed paper that may be used as a lottery ticket"). For the reasons explained below, however, the Court will not pose the proper interpretation of §§ 2057a and 2057b—which do not contain a private right of action—in a civil action to which the United States is not a party.

unlawful if there has previously been a finding of noncompliance by a court or government agency or where there has been a *per se* violation of a statute regulating the sale of a party's goods. *See Armida Winery Inc. v. The Cuban, LLC*, Cancellation No. 92065105, 2018 WL 3689355, at *13 (T.T.A.B. Aug. 1, 2018). Pursuant to this doctrine, the USPTO has refused or cancelled thousands of marks based on its own determination that use of the mark in question was in violation of a federal statute. *See* Robert A. Mikos, *Unauthorized and Unwise: The Lawful Use Requirement in Trademark Law*, 75 Vand. L. Rev. 161, 163–64 (2022).

Some federal appellate courts have adopted a similar version of the TTAB's lawful use requirement in the form of a required affirmative defense in trademark infringement proceedings. *See, e.g., CreAgri, Inc. v. USANA Health Scis. Inc.*, 474 F.3d 626, 630 (9th Cir. 2007) ("[O]nly lawful use in commerce can give rise to trademark priority."); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1225 (10th Cir. 2000) (holding that the Lanham Act protects marks "lawfully used in commerce"). However, several other appellate and trial courts have declined to adopt the doctrine. *See, e.g., FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1086–88 (11th Cir. 2016); *Perry v. H.J. Heinz Company Brands, L.L.C.*, 994 F.3d 466, 475 (5th Cir. 2021); *Breeze Smoke LLC v. Yatin Enters. Inc.*, No. 22-cv-1182, 2023 WL 3070893, at *3–*6 (W.D. Mich. Apr. 25, 2023); *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, No. 20-cv-400, 2022 WL 17477062, at *5–*9 (E.D. Va. Dec. 6, 2022); *Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC*, No. 16-cv-949, 2020 WL 10728951, at *5–*6 (N.D. Ga. Jan. 10, 2020). To date, the Third Circuit Court of Appeals has neither adopted nor rejected the doctrine.

At the outset, the Court emphasizes that the question immediately before it is not whether the USPTO may deny or cancel a trademark because its use has violated some other federal law. Nor is it whether the Court should extend trademark protections to a registrant who may be in

violation of federal law. Rather, the question is whether this Court may cancel a trademark already registered by the USPTO based on the Court's own determination that the mark has been used in a way that violates federal law. Although the Lanham Act grants federal courts "concurrent power to order cancellation" of a trademark, "a petition to the [TTAB] is the primary means of securing a cancellation." *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873 (3d Cir. 1992). Moreover, while a party may directly petition the TTAB for cancellation, the Lanham Act does not permit a plaintiff to sue for cancellation in federal court absent some other basis for federal jurisdiction. *Id.* at 873–74; 15 U.S.C. § 1121. Permitting AFAB to "avoid the TTAB process by raising a defense" or counterclaim of unlawful use to achieve cancellation would circumvent this careful scheme. *Breeze Smoke*, 2023 WL 3070893, at *5. Moreover, as one court recently observed, "whether a mark should be registered is a different inquiry than that presented by an infringement action," and even if a lawful use requirement might make sense in the former context, it may not make sense in the latter because "trademark holders should not be required to repeatedly litigate the question of use to enforce their rights." *Jergenson v. Inhale Int'l Ltd.,* No. 22-cv-2040, 2023 WL 167413, at *4 (N.D. Ill. Jan. 12, 2023).

In deciding whether to adopt the unlawful use doctrine, the Court begins, as it must, with the statutory text. Section 1 of the Lanham Act requires that a mark "is in use in commerce." 15 U.S.C. §1051(a)(3)(C). Section 45 of the Lanham Act defines this term, providing that a mark is "in use in commerce" when it "is placed in any manner on . . . goods or their containers" that are "sold or transported in commerce." 15 U.S.C. §1127. The term "commerce" is further defined as "all commerce which may lawfully be regulated by Congress." *Id.* This jurisdictional language aligns with the bounds of Congress's authority under the Commerce Clause,[5] which empowers

---

[5] In 1879, the Supreme Court held that Congress lacked power to regulate trademarks under the Intellectual Property Clause. *Trade-Mark Cases*, 100 U.S. 82, 93–94 (1879). Since then, Congress has

Congress to regulate both lawful and unlawful commerce. Indeed, it is through this very grant of authority that Congress chose to regulate butyl nitrite and volatile alkyl nitrites. *See* 15 U.S.C. §§ 2051(a)(1), (6). These sections provide no basis for a lawful use requirement.

According to the TTAB, the "lawful use" requirement derives from Section 23 of the Lanham Act, which requires "lawful use in commerce" for a mark to be included on the supplemental register. *See Satinine Societa*, 209 U.S.P.Q. 958, 1981 WL 48126, at *6 n.2. As one TTAB member reasoned, "it would be wholly contradictory to require 'lawful use' for an application to register a mark upon the Supplemental Register but not to require 'lawful use' for an application to register a mark upon the Principal Register, which confers much greater rights upon the registrant." *Id.*, 209 U.S.P.Q. 958, 1981 WL 48126, at *10 (Kera, Member, concurring).

This argument is unavailing for two reasons. First, basic principles of statutory construction teach that the use of a term such as "lawful" in Section 23, but *not* in Sections 1 or 45, strongly implies that Congress did intend to exclude that term from the latter sections. Thus, even if Section 23 imposed a lawful use requirement for inclusion of the Supplemental Register, its conspicuous absence from Sections 1 and 45 would make it clear that any such requirement does not apply to inclusion on the Principal Register.

Second, it is not clear that Section 23's reference to "lawful use in commerce" imposes a requirement that any commerce comply with all federal laws. To the contrary, outside of the TTAB's invocations of the unlawful use doctrine, "the term 'lawful' in Section 23 has been interpreted to mean 'exclusive.'" *Moore Bus. Forms Inc. v. Continu-Forms Inc.*, 9 U.S.P.Q.2d 1907, 1988 WL 252341, at *1 (T.T.A.B. Dec. 8, 1988). The reason for this is that, before the Lanham Act established the Supplemental Register, the Trademark Law of 1920 provided for the

---

regulated trademarks exclusively under its Commerce Clause authority, using the same broad jurisdictional language as in the Lanham Act.

registration of certain marks "which have been in bona fide use for not less than one year in interstate or foreign commerce . . . ." Pub. L. No-66-163, 41 Stat. 533, 534 (1920). The "bona fide" requirement under the 1920 Act was "uniformly interpreted to mean use to the exclusion of others for at least one year." *Kwik-Kopy Franchise Corp. v. Dimensional Lithographers, Inc.*, 173 U.S.P.Q. 378, 1972 WL 17980, at *4 (T.T.A.B. 1972). Because the Supplemental Register was established "as a continuation of the register provided for in . . . the Act of 1920," courts and the TTAB applied that same construction to the term "lawful" in Section 23. *Id.*; *see also Eldon Indus., Inc. v. Rubbermaid, Inc.*, 735 F. Supp. 786, 834 (N.D. Ill. 1990); *Automatic Washer Co. v. Easy Washing Mach. Corp.*, 98 F.Supp. 445, 451 (N.D.N.Y. 1951); *Loctite Corp. v. Nat'l Starch & Chem. Corp.*, 516 F.Supp. 190, 212 (S.D.N.Y.1981). With this in mind, any "lawful use" requirement under Section 23 would appear to focus on exclusiveness of use, not compliance with federal laws.

Nor do other mentions of "lawful use" in the Lanham Act compel the sort of requirement that the TTAB has articulated. Section 2(d) of the Lanham Act permits concurrent registration of a mark within a given territory where the party seeking the concurrent registration has "become entitled to use [the] marks as the result of their concurrent lawful use in commerce" prior to the filing of a nationwide registration. 15 U.S.C. § 1052(d). The term "lawful use" in Section 2(d), however, has been interpreted to mean use of the mark "in a territory not covered by another party's registration." *Fleming Cos. v. Thriftway, Inc.*, 809 F. Supp. 38, 42 (S.D. Ohio, 1992) (citing *Action Temporary Servs. v. Lab. Force, Inc.*, 870 F.2d 1563, 1566 (Fed. Cir. 1989)). The Lanham Act also provides a safe harbor in "cybersquatting" cases where a domain name registrant "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). The term "lawful" as used in that section has been

interpreted as referring to compliance with the Lanham Act, rather than the entirety of federal law. *See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch*, 527 F.3d 1045, 1057–59 (10th Cir. 2008).

Moreover, reading a "lawful use" requirement into Section 1 of the Lanham Act would directly conflict with Section 2 of the Act, which provides that "[n]o trademark . . . shall be refused registration . . . on account of its nature unless" it falls within one of several enumerated, exclusive, prohibitions. 15 U.S.C. § 1052. These prohibitions include marks that are either immoral, deceptive, scandalous, disparaging, geographical, confusing, merely descriptive, or functional; marks consisting of the flag or insignia of a government; marks consisting of the name, image, or signature of a living person or dead president without their consent; and marks that consist primarily of a surname. *Id.* "Unlawful use" is not on that list. Moreover, the fact that all of grounds for refusal in Section 2 relate to the nature of the trademark itself, rather than how it is used in commerce, suggests that the Act is agnostic as to the use of marks with respect to registration.

Reading into the Lanham Act a general lawful use requirement would also conflict with Section 33 of the Act, which makes the use of a trademark "to violate the antitrust laws of the United States" an affirmative defense to an infringement action. 15 U.S.C. § 1115(b)(7). This language would be rendered superfluous and unnecessary if the Lanham Act already included a broad lawful use requirement.

This reading is bolstered by the relevant history. Before the Lanham Act was enacted, every prior trademark statute passed by Congress included an explicit lawful use requirement, making use of a mark in an unlawful business an affirmative defense to an infringement claim. *See, e.g.,* Act of July 8, 1870, Pub. L. No. 41-230, § 84, 16 Stat. 198, 212 (1870) ("[N]o action

shall be maintained under the provisions of this act by any person claiming the exclusive right to any trade-mark which is used or claimed in any unlawful business . . . ."). The omission of such clear text from the Lanham Act satisfies the Court that Congress did not intend to continue this policy.

The lawful use requirement, if applied throughout the Lanham Act, would also produce absurd results. Section 32 of the Act, for example, permits claims for damages against those "who shall, without the consent of the registrant . . . use in commerce" a mark. 15 U.S.C. § 1114. If "commerce" means "lawful commerce," then a plaintiff would be unable to bring a claim against an infringer who happened to be violating some other federal law.

The specific context of this case highlights another, more fundamental problem with the proposed invocation of the unlawful use doctrine. AFAB contends that Pac-West's marks are invalid based on alleged violations of 15 U.S.C. §§ 2057a and 2057b. These statutes, however, do not include private rights of action, meaning Congress has expressly left it to the federal government—not private litigants—to enforce this statute. But under the unlawful use doctrine, this Court would not only have to allow private parties litigate these statutes, but it would also need to interpret these statutes and make determinations of non-compliance, all without any involvement from the Government. It would be anomalous for Congress to bar private litigation of these statutes in all civil suits, except in the context of a trademark infringement suit. *See, e.g., Hi-Tech Pharms. Inc.,* 2020 WL 10728951, at *6.

For all the foregoing reasons, the Court declines to adopt the unlawful use doctrine. Because of this, the Court finds that AFAB's counterclaims for unlawful use and abandonment based on unlawful use (Counts VI and VII) fail as a matter law and grants summary judgment on these counts in favor of Pac-West.

### III.    Count VIII – Fraud

Count VIII of AFAB's counterclaims asserts that Pac-West's marks should be cancelled because Pac-West obtained them by committing fraud upon the USPTO. This, if proven, is grounds for cancellation. 15 U.S.C. §§ 1064(3), 1065. Fraud in this context involves either misrepresentations or omissions "of material information or facts which, if disclosed to the [USPTO], would have resulted in the disallowance of the registration sought or to be maintained." *La Cena Fine Foods, Ltd. v. Jennifer Fine Foods*, No. 01-cv-5746, 2006 WL 2014503, at *4 (D.N.J. July 18, 2006).

To prove fraud on the USPTO, AFAB must establish, by clear and convincing evidence, that: (1) Pac-West made a false representation regarding a material fact; (2) Pac-West knew that the representation was false when made; (3) Pac-West intended to induce the USPTO to act in reliance on the misrepresentation; (4) actual, reasonable reliance on the misrepresentation by the USPTO; and (5) proximately resulting damages. *Id.* at *5. All this must be "proven 'to the hilt[6]'" and "any doubt must be resolved against the charging party." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). Moreover, "[b]ecause of the heightened standard of proof for fraud claims, in order to avoid summary judgment, the party with the burden must present evidence of fraud from which a jury could, by clear and convincing evidence, find such fraud." *Rosemont Taxicab Co. v. Phila. Parking Auth.*, 327 F. Supp. 3d 803, 830 (E.D. Pa. 2018); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 206–08 (3d Cir. 2022).

---

[6] Admittedly, "to the hilt" is not a well-used judicial term for guiding litigants as they prepare for hearings and trials. Nonetheless, it strikes this Court as evidencing a judicial expectation of "clear and convincing" evidence of each of the requirements.

Here, AFAB alleges that Pac-West's owner, Trent Taylor, made knowing misrepresentations to the USPTO in Pac-West's trademark application by stating, in response to a request from the Examining Attorney, that "[t]o the best of [Pac-West's] knowledge, its products were "in compliance with all relevant federal law, including [15 U.S.C. §§ 2057a and 2057b]" because they were "not intended for digestion, inhalation, as "poppers," or any use other than as a multi-purpose solvent cleaner." Taylor Dep. at 105:13–106:1; Ex. 19 to Taylor Dep.

AFAB argues that this statement is false because Pac-West in fact intended its products to be used for unlawful purposes and it intentionally withheld this information from the USPTO in order to procure a trademark registration. As a threshold question, though the Court declines to adopt the unlawful use doctrine for the reasons discussed above, it nonetheless recognizes that the USPTO has applied, and continues to apply, the doctrine when deciding whether to grant a trademark registration. Therefore, information that might lead the USPTO to reject a trademark application for unlawful can be material here, and the misrepresentation or omission thereof may satisfy the first element of a fraud claim. *Cf. BBK Tobacco & Foods LLP v. Cent. Coast Agric. Inc.*, 615 F. Supp. 3d 982, 1028–29 (D. Ariz. 2022).

In support of its claim, AFAB cites two pieces of evidence. First, AFAB points to various archival captures of a website, nitroaroma.com, which Mr. Taylor testified that he owned and sold products through—including some under the RUSH mark—prior to starting Pac-West. These archival captures, taken from 2001, 2003, 2004, 2008, and 2014, refer to products sold under the RUSH mark as "poppers." *See* Ex. 28–32 to Taylor Dep. A number also include paragraphs describing how "poppers" may be used to achieve supposedly euphoric effects. Ex. 28–30 to Taylor Dep. At the same time, these captures also include explicit statements that RUSH and other

products sold on the website are marketed solely as cleaning products and that they should only be used in accordance with their labels. *Id.* at Ex. 28–30.

Second, AFAB points to Mr. Taylor's deposition testimony, in which he acknowledged that he was selling "poppers" through this website and that the descriptive paragraphs were included so that the website would appear in search engine results.[7] Taylor Dep. at 120:13–121:1; 124:9–24; 125:17–21; 126:24–127:4; 127:20–128:4; 128:21–23.

### A. <u>Whether the Evidence Supports a Finding That Pac-West Made a False Representation to the USPTO</u>

To demonstrate fraud, AFAB must first proffer evidence that Pac-West's statement or omission was false. Where the statement at issue is unambiguous, "proving falsity is straightforward: A statement is false if it is 'untrue.'" *United States v. Harra*, 985 F.3d 196, 209 (3d Cir. 2021). But if the statement is susceptible to multiple meanings, some of which are not untrue, the claimant must produce evidence that the statement means what they claim it means. Put another way, they must prove that the statement *is* false, not simply that it could be *interpreted* in a way that would or could render it false. Thus, before the Court can consider whether AFAB has met its burden as to the falsity of Pac-West's statement, it must first consider whether AFAB has met its burden as to the meaning of the statement.

Under AFAB's theory, when Mr. Taylor said that that Pac-West's products were "not intended for digestion, inhalation, as 'poppers,' or any use other than as a multi-purpose solvent cleaner," he was representing to the USPTO that Pac-West did not harbor either a purpose or

---

[7] It is unclear from Mr. Taylor's deposition testimony whether these descriptive paragraphs would have been visible to the website user. *See* Taylor Dep. at 125:9–12 ("I think it was invisible where – you know, how they stuff stuff in there visible, and the Google figured it out in the search engines. It may not. But it's still there.").

expectation that consumers would use its products for unlawful purposes.[8] Taylor Dep. at 105:13–106:1. But Mr. Taylor's statement can also be read as representing that, as of the time the statement was made as part of the trademark application,[9] Pac-West's products were not marketed or otherwise held out to the public in a way that encouraged unlawful uses. It might also be read as representing Mr. Taylor's understanding that Pac-West's products were not "intended" for unlawful uses because their labeling specifically disclaimed such uses.

This ambiguity illustrates why courts do not consider "isolated statement[s]" when determining if a false representation has been made, and instead look to "the full context of the document." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). This is particularly important where, as here, Pac-West's statement was made in response to a specific request from the USPTO. *Cf. Anhing Corp. v. Thuan Phong Co.*, 215 F. Supp. 3d 919, 936 (C.D. Cal. 2015) (explaining that it is necessary to examine what the USPTO's requested of an application to determine whether a statement or omission was false).

Here, the USPTO did not ask Pac-West if consumers had ever used its products unlawfully, nor did it ask whether Pac-West had ever sold its products with the understanding or expectation that consumers would do so. Rather, the USPTO's request was limited to whether Pac-West's products complied with federal law, including §§ 2057a and 2057b. *See* Ex. 19–20 to Taylor Dep. Mr. Taylor responded by first stating that, "[t]o the best of the company's knowledge," its products

---

[8] *See Intend, Black's Law Dictionary* (11th ed. 2019) ("1. To have in mind a fixed purpose to reach a desired objective; to have as one's purpose . . . . 2. To contemplate that the usual consequences of one's act will probably or necessarily follow from the act, whether or not those consequences are desired for their own sake . . . .").

[9] The USPTO requested information as to whether or not Pac-West's products "comply with relevant federal law," and Mr. Taylor responded that the products "are in compliance." *See* Ex. 19–20 to Taylor Dep. The use of the present tense in both the request and response reflect a focus on compliance as of the time Pac-West's application was filed. The USPTO did not request information on whether Pac-West's products had *ever* not been in compliance with federal law, and Mr. Taylor did not represent that its products had *always* been in compliance.

were in compliance. *Id.* Only then did he go on to state that Pac-West's products "are not intended for ingestion, inhalation, as 'poppers,' or any use other than as a multi-purpose solvent cleaner" and that "[t]here are numerous warnings on the packaging stating specifically that the products should not be ingested or inhaled." *Id.* Both follow-up statements must be read in context as proffering support and reasons behind Pac-West's stated belief that its products complied with federal law.

This context is significant for two reasons. First, it makes clear that neither the USPTO's request nor Mr. Taylor's response was focused on the potential unlawful uses of Pac-West's products by individual consumers. If the USPTO had specifically asked Pac-West if it were aware that consumers used its products unlawfully, Pac-West would have had an obligation to disclose any such knowledge. But absent such a request, "a trademark applicant need not affirmatively disclose every existing or potential unlawful use" of a product. *Cookies SF*, 2022 WL 18228278, at *4.

Second, this context informs the meaning of the term "intended" as used in Mr. Taylor's statement. AFAB's theory of fraud hinges on reading Mr. Taylor's statement as representing Pac-West's subjective intent for how its products would be used. But in the context of a request about compliance with federal law, Mr. Taylor's statement is more plausibly understood as representing how Pac-West's products were marketed and labeled at the time the statement was made.

Because there is more than one way to interpret fairly Mr. Taylor's statement, the burden is on AFAB to produce evidence that would allow a jury, by clear and convincing evidence, to conclude that its interpretation is the correct one. AFAB has produced no evidence whatsoever as to what Mr. Taylor intended his statement to mean or how the USPTO understood it. Rather,

AFAB's fraud claim wholly depends on the jury resolving the statement's ambiguity in AFAB's favor. But in such a claim of fraud, "any doubt must be resolved *against* the charging party." *In re Bose Corp.*, 580 F.3d at 1243 (emphasis added). Therefore, the Court finds that AFAB has failed to satisfy the "clear and convincing" evidentiary standard as to the meaning—and therefore falsity—of Mr. Taylor's statement. But even assuming AFAB had satisfied its burden to show that Mr. Taylor's statement meant what AFAB claims it meant, the evidence is also insufficient to demonstrate Mr. Taylor's knowledge of the falsity of this statement or his intent to deceive.

**B.** **Whether the Evidence Supports a Finding That Pac-West Knew the Representation Was False and Intended to Deceive the USPTO**

In addition to actual falsity, AFAB must also produce clear and convincing evidence that Pac-West knew or believed that its representation was false and that it intended to deceive the USPTO. Here, there is no direct evidence of either. While it is true that knowledge and intent may be inferred from circumstantial evidence, "such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the [knowledge or] deceptive intent requirement." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). "Further, the inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the *single most reasonable inference* able to be drawn from the evidence to meet the clear and convincing standard." *Id.*

AFAB's theory of knowledge rests on circumstantial evidence—Mr. Taylor's statement and the website captures—and multiple inferences. First, a jury would need to infer, based on the website captures, that Pac-West's predecessors subjectively intended that consumers would use their products unlawfully. A jury would then need to infer that Pac-West adopted and maintained this same subjective intent as of the time years later when it applied to the USPTO for a trademark. A jury would also need to infer that Mr. Taylor understood his statement to mean that Pac-West

19

*did not* have this subjective intent, as opposed to referring to Pac-West's marketing and labeling practices.

Going further, for a jury to find deceptive intent, it would also have to infer that Mr. Taylor knew or believed that Pac-West's subjective intent was material to whether its products complied with federal law, that the examining governmental attorney's request required him to disclose this subjective intent, and that he made the deliberate decision to craft his statement with the specific intent of deceiving the USPTO.

It is not at all clear to the Court that these are all reasonable inferences, let alone the *single most reasonable* inferences that a jury could reach based on the scant evidence in the record. First, as discussed above, Mr. Taylor's statement could be understood as referring to how Pac-West marketed and labeled its products, rather than the company's subjective intent as to how consumers might use its products. A jury could reasonably infer that Mr. Taylor understood his statement to have either of these meanings. AFAB, however, has provided no evidence to suggest that Mr. Taylor understood his statement to refer to Pac-West's subjective intent, let alone that this is the single most reasonable inference that could be drawn. To the contrary, as discussed above, the context of Mr. Taylor's statement suggests that the opposite inference may be more likely.

Second, AFAB has provided no evidence to suggest that Mr. Taylor believed that Pac-West's subjective intent was material to the USPTO's request about compliance with federal law. It is a reasonable inference that Mr. Taylor believed that the marketing and labeling of Pac-West's products, including explicit disclaimers against unlawful uses, meant that its products were not "intended" for unlawful uses and therefore complied with federal law. AFAB, of course, contends that such a belief would be incorrect based on its theory of the law. But, as discussed above, a civil case between private litigants is not the appropriate forum to determine whether

Pac-West's products comply with §§ 2507a and 2057b. In any event, it is beside the point how a court might resolve this issue on the merits. What matters on this claim is what Mr. Taylor knew or believed, and a fraud claim "will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true." *Warman v. Loc. Yokels Fudge, LLC*, No. 19-cv-1224, 2022 WL 17960722, at \*13 (W.D. Pa. Dec. 27, 2022). AFAB has presented no evidence, let alone clear and convincing evidence, to suggest that Mr. Taylor did not believe that his statement was true when he made it.

Third, to the extent that AFAB argues that Mr. Taylor's statement was misleading because it omitted information about the subjective intent or marketing of Pac-West or its predecessors, AFAB has provided no evidence to suggest that Mr. Taylor understood that the examining attorney's request requiring him to disclose this information. The Lanham Act does not impose any affirmative duty on trademark applicants to disclose any more than what is requested by the USPTO. *See, e.g, Veliz v. Veliz*, No. 19-cv-94, 2021 WL 4538489, at \*5 (S.D. Tex. Aug. 12, 2021); *Anhing Corp.*, 215 F. Supp. 3d at 936. And the examining attorney's request was limited to whether Pac-West's products were currently in compliance with federal law. Without clear and convincing evidence that Mr. Taylor deliberately omitted material information that he was required to disclose, AFAB cannot prevail on a claim of fraud by omission.

Finally, there is no evidence to suggest that Mr. Taylor specifically intended to deceive the USPTO. Even if Mr. Taylor's statement that Pac-West's products complied with federal law because they were not "intended" for unlawful purposes was inaccurate, "[t]here is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive." *In re Bose*, 580 F.3d at 1246. AFAB has not presented clear and convincing evidence that Mr. Taylor's statement (if inaccurate) was the result of a deliberate intent

to deceive, rather than inadvertence or mistake.  Nor has AFAB presented evidence that any omission was deliberate, rather than inadvertent or the product of mistake.

For all these reasons, the Court finds that AFAB has failed to satisfy its burden to produce evidence from which a jury could find either knowledge or deceptive intent by clear and convincing evidence.  Therefore, the Court grants summary judgment in favor of Pac-West on AFAB's fraud counterclaim.

## CONCLUSION

For the foregoing reasons, the Court grants Pac-West's motion for summary judgment as to Counts VI, V, VI, VII, and VIII of AFAB's counterclaims[10] and deems the motion moot as to Count III.  An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[10] Because the Court grants summary judgment on the unlawful use, abandonment, and fraud counterclaims, it does not address Pac-West's affirmative defenses to these claims.